The undersigned have reviewed the Award based upon the record of the proceedings before the deputy commissioner.
The appealing party has shown good grounds to reconsider the evidence. Upon much detailed reconsideration of the evidence as a whole, the undersigned reach somewhat different facts and conclusions from those reached by the deputy commissioner and therefore make certain material modifications to the original opinion and award. The Full Commission, in their discretion, have determined that there are no good grounds in this case to receive further evidence or to rehear the parties or their representatives, as sufficient convincing evidence exists in the record to support their findings of fact, conclusions of law, and ultimate award.
 ***********
The parties' Industrial Commission Form 21, Agreement for Compensation of Disability, having been approved by the Industrial Commission, constitutes an Award and is hereby incorporated by reference.
In addition, the undersigned find as fact and conclude as matters of law the following, which were entered into by the parties at the initial hearing and by post-hearing agreement as
 STIPULATIONS
1. Two pages of plaintiff's medical records received on September 17, 1997, are admitted into evidence.
2. Five pages of plaintiff's medical records from Dr. Brewington and Johnston Memorial Hospital, received from defendants' counsel of October 6, 1997, are admitted into evidence.
3. A set of plaintiff's medical records received from defendants' counsel on January 6, 1997, is admitted into evidence.
 EVIDENTIARY RULINGS
The objections appearing in the depositions of Dr. Maultsby, Dr. Vyas, and Mr. Page are OVERRULED.
 ***********
Based upon all of the competent, credible, and convincing evidence of record, the undersigned make the following additional
 FINDINGS OF FACT
1. At the time of the initial hearing, plaintiff was thirty-eight years old. He graduated from high school in 1976. While in high school, plaintiff worked in the construction industry. He also worked as a cook and as a tire changer. After high school, the plaintiff worked hanging dry wall. The plaintiff continued working as a dry wall hanger through 1991, when he was involved in a head-on automobile collision.
2. Plaintiff sustained multiple injuries as a result of the 1991 automobile collision, having sustained a right shoulder injury as a result of the automobile collision. However, plaintiff presented to Dr. Vyas on May 24, 1994, complaining of right shoulder pain which he had experienced since his automobile accident in 1991.
3. In June 1995, plaintiff applied for social security disability benefits. In his application, he identified his disabling condition as chronic liver disease, migraine headaches, "shakes" and "passing blood". He stated that these conditions began as a result of the 1991 automobile collision. He further stated that as a result of these injuries he only returned to work part-time after 1991. He stated that after working one or two hours he would get the "shakes". Finally, plaintiff stated that from 1978 through 1994 he had worked sporadically as a dry wall hanger and that he had worked only three days per week.
4. On October 27, 1994, plaintiff was employed as a dry wall hanger by his brothers who were subcontractors on a project where defendant-employer was the general contractor. While working as a dry wall hanger on that date, plaintiff fell and re-injured his right shoulder.
5. Plaintiff presented to Dr. Vyas on October 28, 1994. On that date, plaintiff had right anterior shoulder pain. His right shoulder range of motion was limited as well. Dr. Vyas prescribed medications and directed plaintiff to return for follow up treatment. Plaintiff's shoulder condition improved some, but he continued having pain and a limited range of motion. Therefore, Dr. Vyas referred plaintiff to Dr. Maultsby, an orthopaedic surgeon.
6. Beginning on November 7, 1994, plaintiff's right shoulder condition was treated by Dr. Maultsby. Initially, Dr. Maultsby treated plaintiff conservatively, and plaintiff's shoulder symptoms improved. However, when plaintiff helped a friend to lift a utility pole, he exacerbated his shoulder condition, and Dr. Maultsby decided to perform surgery. The surgery, a subacromial decompression, was initially scheduled to be performed on December 8, 1994, but was canceled due to plaintiff's consumption of alcohol prior to his scheduled surgery. The surgery was rescheduled and performed on January 5, 1995.
7. During or as a result of his surgery, Dr. Maultsby determined that plaintiff bled excessively. Therefore, Dr. Maultsby referred plaintiff back to Dr. Vyas, who conducted tests which revealed that plaintiff had a low platelet count. Plaintiff's low platelet count was due to end-stage liver disease. Plaintiff's end-stage liver disease was not caused or aggravated by the incident on October 27, 1994. Rather, his liver disease was caused by Hepatitis C, which he contracted as a result of past intravenous drug use. Plaintiff also had advanced liver cirrhosis.
8. After his surgery, plaintiff's shoulder condition improved. His pain was diminished, and his range of motion consistently increased. Dr. Maultsby released plaintiff to return to work on February 13, 1995 with a restriction against lifting greater than ten pounds.
9. When plaintiff returned to Dr. Maultsby on March 13, 1995, he was undergoing treatment for his end-stage liver disease. Although he had some limitation of motion on flexion and abduction, he had a functional range of motion of his shoulder, with minimal discomfort. He was able to ignore his shoulder discomfort. Apart from his liver condition, plaintiff was capable of regular work.
10. Plaintiff next presented to Dr. Maultsby on June 13, 1995. Plaintiff had been scheduled to return to Dr. Maultsby prior to that date, but he had not done so. Plaintiff was determined to have reached maximum medical improvement by June 13, 1995. He retained a ten percent permanent impairment of his right arm as a result of his compensable injury on October 27, 1994.
11. After being released to return to regular duty work, plaintiff did not seek to return to work for defendant-employer. Defendant-employer had work available to plaintiff which he would have been capable of performing except for his liver condition. In addition to the employment that was available to plaintiff with defendant-employer, there was other employment available in the vicinity of plaintiff's residence that would have been suitable to his physical capacity except for his end-stage liver disease.
12. Plaintiff did return to work for his brother "spotting nails". Plaintiff earned $100.00 per day for his work "spotting nails". Plaintiff testified that he was unable to work more than one day per week due to shoulder pain. However, in late March or early April 1995, when plaintiff was referred to Dr. Barish for evaluation of his liver disease, he told Dr. Barish that he had been unable to have repeat diagnostic studies because he had been too busy at work. Plaintiff did not inform defendants or the Industrial Commission that he had returned to work.
13. As a result of his end-stage liver disease, plaintiff was eventually placed on the liver transplant list at Duke University Medical Center. Plaintiff's liver disease caused his liver and spleen to become enlarged. This condition causes plaintiff to have extreme fatigue, weakness, migraine headaches, swollen ankles and overall body pain. At times, plaintiff's condition is so debilitating that he is unable to get out of bed, even to use a telephone. On February 10, 1997, the date the parties were to participate in a mediated settlement conference, plaintiff's liver condition rendered him incapable of getting out of bed. On one occasion, plaintiff was scheduled to receive a liver transplant at Duke University Medical Center, but he was so weak that he declined to receive the liver transplant. The physicians treating plaintiff for his liver disease advised him to stay out of the sun and not to get hot.
14. Defendant-insurer terminated payment of compensation to plaintiff on March 20, 1995. Defendant-insurer did not apply to the Industrial Commission for an order allowing it to terminate payment of plaintiff's disability compensation, despite there being an approved Form 21 Agreement in this case.
15. Based upon the examination and opinions of Dr. Maultsby, the undersigned do not accept as credible or convincing plaintiff's testimony that his shoulder condition rendered him incapable of returning to work as a dry wall hanger after June 13, 1995, the date plaintiff was determined by Dr. Maultsby to have reached maximum medical improvement.
16. Since June 13, 1995, plaintiff has been capable of returning to work as a dry wall hanger or to other regular employment, and any inability to return to that employment or any other employment was not caused by his right shoulder injury, but rather was caused by his non-compensable end-stage liver disease.
 ***********
The foregoing findings of fact and conclusions of law engender the following additional
CONCLUSIONS OF LAW
1. The parties' Form 21, Agreement for Compensation for Disability, created a presumption of continuing disability in favor of plaintiff. Watkins v. Central Motor Lines, 279 N.C. 132,181 S.E.2d 588 (1971). The presumption of continuing disability created by the parties' agreement is a rebuttable one. Rule 401(1) of the Workers' Compensation Rules of the North Carolina Industrial Commission.
2. Defendants successfully and convincingly rebutted the presumption of plaintiff's continuing disability with competent and credible medical evidence showing that plaintiff's shoulder injury reached maximum medical improvement, that plaintiff was capable of returning to regular work, that suitable work was available to plaintiff, and that plaintiff's failure to obtain employment after June 13, 1995 was due to a disabling medical condition unrelated to his compensable injury. Therefore, plaintiff is entitled to temporary total disability compensation from the period from March 20, 1995, the date defendant unilaterally terminated compensation, until June 13, 1995, the date plaintiff was determined to have reached maximum medical improvement. N.C.G.S. § 97-29, N.C.G.S. § 97-30; Stone v. G. G.Builders, 346 N.C. 154, 484 S.E.2d 365 (1997).
3. Plaintiff is entitled to payment of permanent partial disability compensation at the rate of $200.01 per week for twenty-four weeks. N.C.G.S. § 97-31 (13).
4. Plaintiff is entitled to payment of all medical expenses incurred as a result of his injury on October 27, 1994. N.C.G.S. § 97-25.1.
5. As defendants terminated payment of compensation without approval of the Industrial Commission and as a period of additional compensation was due plaintiff, he is entitled to have a penalty assessed against defendants in the amount of 10% on the amounts due from March 20, 1995 through June 13, 1995. N.C.G.S. § 97-18.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the undersigned enter the following
 AWARD
1. Defendants shall pay plaintiff temporary total disability at the rate of $200.01 per week from March 20, 1995 through June 13, 1995, payable in a lump sum subject to a ten percent (10%) penalty and subject to the attorney's fee approved in paragraph 4.
2. Defendants shall pay plaintiff permanent partial disability compensation at the rate of $200.01 per week for twenty-four weeks. This amount shall be paid in a lump sum, subject to the attorney's fee approved in paragraph 4.
3. Defendants shall pay all medical expenses incurred by plaintiff as a result of his shoulder injury on October 27, 1994.
4. A reasonable attorney's fee of twenty-five percent of the compensation due plaintiff is approved for plaintiff's attorney and shall be paid as follows: twenty-five percent of the lump sum due plaintiff in paragraphs 1 and 2 shall be deducted from that amount and paid directly to plaintiff's attorney.
 ORDER
1. Defendant's motion to assess the costs of Dr. Vyas' deposition against plaintiff is denied.
2. Defendants shall pay the costs of the depositions of Dr. Maultsby, Dr. Vyas, and Mr. Page.
3. Defendants shall pay the costs, including expert witness fees of $260.00 and $225.00 to Drs. Maultsby and Vyas, respectively.
This case is ORDERED REMOVED from the Full Commission hearing docket.
This the ___ day of _________, 1998.
 S/ _______________________ J. HOWARD BUNN, JR. CHAIRMAN
CONCURRING:
S/ _____________________ BERNADINE S. BALLANCE COMMISSIONER
S/ _____________________ RENÉE C. RIGGSBEE COMMISSIONER